UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MANEHU PRODUCT ALLIANCE LLC, d/b/a MANTELMOUNT,

          Plaintiff/Counterdefendant,

v.

TRANSFORM PARTNERS LLC d/b/a MOUNT-IT!,

          Defendant/Counterclaimant.

Case No.:  24-cv-01814-BJC (MMP)

**CLAIM CONSTRUCTION ORDER**

In the present action, Plaintiff Manehu Product Alliance LLC doing business as MantelMount ("MantelMount") asserts claims of patent infringement against Defendant Transform Partners LLC doing business as Mount-It! ("Mount-It"), alleging infringement of U.S. Patent Nos. 8,724,037 ("the '037 Patent"), 10,257,460 ("the '460 Patent"), 10,277,860 ("the '860 Patent"), 10,281,080 ("the '080 Patent"), 10,935,180 ("the '180 Patent"), 11,346,493 ("the '493 Patent"), 11,607,042 ("the '042 Patent"), 11,849,246 ("the '246 Patent"), and 11,856,317 ("the '317 Patent") (collectively, "the asserted patents"). (Doc. No. 1, Compl. ¶¶ 23–56.)  On August 12 and 15, 2025, the parties filed their joint claim construction hearing statement, chart, and worksheet pursuant to Patent Local Rule 4.2, identifying the disputed claim terms from the asserted patents. (ECF Nos. 35, 37.)  On

September 9, 2025, the parties each filed their opening claim construction briefs. (ECF Nos. 39, 40.) On September 23, 2025, the parties each filed their responsive claim construction briefs. (ECF Nos. 43, 44.)

The Court held a claim construction hearing on April 14, 2026. (ECF No. 49.) After considering the parties' briefing and the arguments present at the hearing, the Court issues the following claim construction order.

## I.    BACKGROUND

The following factual allegations are taken from Plaintiff MantelMount's complaint. MantelMount is a designer of television wall mounts, with a specific focus on manual and motorized mounts that lower a television for a better viewing angle (for example, from above a fireplace). (Doc. No. 1, Compl. ¶ 7.) MantelMount is the sole owner of the asserted patents. (Id. ¶¶ 9–17.)

Defendant Mount-It sells television wall mounts throughout the United States through various channels of trade. (Id. ¶ 18.) MantelMount alleges that Mount-It infringes the asserted patents by making, using, selling, offering for sale, and/or importing its television wall mounts (for example, Mount-It Product Nos. MI – 361 and MI-395) or by inducing its customers to practice one or more claimed methods. (See id. ¶¶ 24, 28, 31, 34, 38, 42, 46, 50, 54, Exs. K–S.)

The asserted patents are all related and all share similar specifications with overlapping disclosures. See U.S. Patent No. 11,856,317, col. 1 ll. 6–22 (issued Dec. 26, 2023); U.S. Patent No. 11,346,493, col. 1 ll. 7–35 (issued May 31, 2022). The '037 Patent and '460 Patent are entitled "mounting system." U.S. Patent No. 8,724,037, at [54] (issued May 13, 2014); U.S. Patent No. 10,257,460, at [54] (issued Apr. 9, 2019). The '860 Patent is entitled "methods for installing and using television mounting systems." U.S. Patent No. 10,277,860, at [54] (issued Apr. 30, 2019). The '080 Patent is entitled "adjustable mounting systems for televisions." U.S. Patent No. 10,281,080, at [54] (issued May 7, 2019). The '180 Patent and '493 Patent are entitled "motorized mounting system for televisions." U.S. Patent No. 10,935,180, at [54] (issued Mar. 2, 2021); '493 Patent at [54].

Lastly, the '042 Patent, '246 Patent, and '317 Patent are entitled "television mounting systems." U.S. Patent No. 11,607,042, at [54] (issued Mar. 21, 2023); U.S. Patent No. 11,849,246, at [54] (issued Dec. 19, 2023); '317 Patent at [54].

The specifications of the asserted patents explain that the disclosed invention relates generally to mounting systems for mounting objects to structures and more specifically to mounting televisions to a wall. See '037 Patent col. 1 ll. 14–31. The specification for the '037 Patent explains:

> In certain embodiments, a wall mount can hold an electronic display in the form of a television. The wall mount can be installed above a fireplace or other aesthetically pleasing location. A user can manually or automatically lower the television such that the television is generally in front of the fireplace. A viewer's eyes can be generally level with the center of the screen. The television can be panned, tilted (e.g., rotated about a generally horizontal axis), and/or swiveled (e.g., rotated about a generally vertical axis) to accommodate different viewing positions. Pivots, swivels (e.g., swivel brackets), joints, or the like can be used to provide the desired motion.

Id. at col. 1 ll. 40–52.

An embodiment of such a wall mount with a television installed above a fireplace in both its stowed and a lowered position is depicted in the figures below from the '037 Patent's specification.



FIG. 2

FIG. 3

Id. at figs. 2, 3.

/ / /

/ / /

/ / /

24-cv-01814-BJC (MMP)

The figure below depicts an isometric view of a mounting system in accordance with one embodiment of the claimed invention.



FIG. 4

Id. fig. 4.

24-cv-01814-BJC (MMP)

As an exemplary claim of such a mounting system, Independent Claim 8 of the '460 Patent recites:

A mounting system, comprising:

a display bracket configured to hold a television;

a fixed support bracket;

an upper member and a lower member each rotatably coupled to the display bracket and the fixed support bracket such that the display bracket is movable from a raised position to a lowered position, wherein a top portion of the display bracket is lower than a top portion of the fixed support bracket when the display bracket is in the lowered position; and

a counterbalance mechanism configured to provide a counterbalancing force, the counterbalance mechanism including

at least one piston, and

an adjustment mechanism coupled to the fixed support bracket, the adjustment mechanism includes a carriage coupled to a first end of the at least piston, wherein the carriage translates vertically along the fixed support bracket to change a length of the at least one piston while the display bracket is held substantially stationary, wherein the carriage is configured to be held at a set vertical position while the display bracket is moved between the raised and lowered positions.

'460 Patent col. 12 ll. 17–40.

On October 9, 2024, MantelMount filed a complaint for patent infringement against Mount-It, alleging infringement of the asserted patents.  (ECF No. 1, Compl.)  On January 5, 2025, Mount-It filed its answer to MantelMount's complaint.  (ECF No. 8.)  On April 18, 2025, the Court issued a scheduling order in the action.  (ECF No. 20.)  On August 15, 2025, Mount-It filed an amended answer and counterclaims.  (ECF No. 34.)

By the present claim constructions briefs, charts, and worksheets, the parties request that the Court resolve eight claim construction disputes from the asserted patents.  (ECF Nos. 35, 37, 39, 40, 43, 44.)

## II.    DISCUSSION

### A.    Legal Standards for Claim Construction

Claim construction is an issue of law for the court to decide.  Teva Pharms. USA,

24-cv-01814-BJC (MMP)

Inc. v. Sandoz, Inc., 574 U.S. 318, 326 (2015); Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary."  Teva, 574 U.S. at 326.

"It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted).  "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'"  O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc)); accord Kaufman v. Microsoft Corp., 34 F.4th 1360, 1369 (Fed. Cir. 2022).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art [("PHOSITA")] in question at the time of the invention."  Phillips, 415 F.3d at 1312–13.  "In some cases, the ordinary meaning of claim language as understood by a [PHOSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  Id. at 1314.  "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent."  O2 Micro, 521 F.3d at 1360.  If the meaning of the term is not readily apparent, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'"  Phillips, 415 F.3d at 1314 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence.'"  Id. (quoting Innova, 381 F.3d at 1116); see Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1217–18 (Fed. Cir. 2014).

In determining the proper construction of a claim, a court should first look to the language of the claims.  See Allergan Sales, LLC v. Sandoz, Inc., 935 F.3d 1370, 1373

24-cv-01814-BJC (MMP)

(Fed. Cir. 2019) ("'[C]laim construction must begin with the words of the claims themselves.'"); Source Vagabond Sys. Ltd. v. Hydrapak, Inc., 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("'a claim construction analysis must begin and remain centered on the claim language itself'"). The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term. See Phillips, 415 F.3d at 1314.

A court must also read claims "in view of the specification, of which they are a part." Markman, 52 F.3d at 979; see 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."). "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" Vederi, LLC v. Google, Inc., 744 F.3d 1376, 1382 (Fed. Cir. 2014) (quoting AIA Eng'g Ltd. v. Magotteaux Int'l S/A, 657 F.3d 1264, 1272 (Fed. Cir. 2011)).

But "[t]he written description part of the specification does not delimit the right to exclude. That is the function and purpose of claims." Markman, 52 F.3d at 980. Therefore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1327 (Fed. Cir. 2012); accord Openwave Sys., Inc. v. Apple Inc., 808 F.3d 509, 514 (Fed. Cir. 2015).

In addition to the claim language and the specification, the patent's prosecution history may be considered if it is in evidence. Phillips, 415 F.3d at 1317. The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office ("PTO")] and includes the prior art cited during the examination of the patent." Id. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." Id. "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id. In addition, a court should also consult the

8

prosecution history "so that the court can exclude any interpretation that was disclaimed during prosecution." Sorensen v. Int'l Trade Comm'n, 427 F.3d 1375, 1378 (Fed. Cir. 2005) (citing Phillips, 415 F.3d at 1317).

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. See Vitronics, 90 F.3d at 1583; Teva, 574 U.S. at 331; see also Seabed Geosolutions (US) Inc. v. Magseis FF LLC, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."). However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting Phillips, 415 F.3d at 1317). A court must evaluate all extrinsic evidence in light of the intrinsic evidence. Phillips, 415 F.3d at 1319. "'[E]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims.'" Genuine Enabling Tech. LLC v. Nintendo Co., 29 F.4th 1365, 1373 (Fed. Cir. 2022); see also Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1290 (Fed. Cir. 2015) ("Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"). In cases where subsidiary facts contained in the extrinsic evidence "are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." Teva, 574 U.S. at 332.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." O2 Micro, 521 F.3d at 1362; see also Eon Corp. IP Holdings v. Silver Spring Networks, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) ("'[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.'"). In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies. O2 Micro, 521 F.3d at 1360; Phillips, 415 F.3d at 1314. But "[a] determination that a claim

24-cv-01814-BJC (MMP)

term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." O2 Micro, 521 F.3d at 1361.  If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute.  Id. at 1362; Eon, 815 F.3d at 1319.

**B.  Disputed Claim Terms**

    1.  "rotatably coupled" and "pivotally coupled"

Mount-It proposes that the claim terms "rotatably coupled" and "pivotally coupled" be given their plain and ordinary meaning, which Mount-It contends is "couple to [an object] with a pivot."  (ECF No. 39 at 6.)  MantelMount agrees that the claim term should be given its plain and ordinary meaning but contends that no additional construction is necessary.  (ECF No. 40 at 8.)

For this claim term, both parties contend that these two terms should be given its plain and ordinary meaning.  However, a review of the briefing shows that the parties have a concrete dispute regarding the precise scope of the claim terms "rotatably coupled" and "pivotally coupled."  Mount-It contends that the claim terms specifically require that the two components at issue be directly connected to each other via a specific object – a "pivot."  (See ECF No. 39 at 7–8; ECF No. 43 at 1–2.)  In contrast, MantelMount contends that the claim terms do not require a direct connection or a specific "pivot" object.  (See ECF No. 40 at 9–10; ECF No. 44 at 1.)  Because the parties dispute the proper scope of the terms "rotatably coupled" and "pivotally coupled," it is the Court's duty to resolve this dispute.  See O2 Micro, 521 F.3d at 1362; Eon, 815 F.3d at 1319.

The Court begins its analysis by reviewing the claim language.  The claims terms "rotatably coupled" and "pivotally coupled" are found throughout many of the asserted claims from the asserted patents.  As an example of how the claims term are used in the claims, Independent Claim 8 of the recites a mounting system, comprising, among other things: a "display bracket," a "fixed support bracket," an "upper member," and a "lower member" where the upper member and the lower member are each "rotatably coupled to

24-cv-01814-BJC (MMP)

the display bracket and the fixed support bracket such that the display bracket is movable from a raised position to a lowered position." '460 Patent col. 12, ll. 18–24.  Similarly, Independent Claim 19 of the '080 Patent recites a motorized television mounting system, comprising, among other things: a "television holder assembly," a "mounting assembly," and an "arm assembly" where the arm assembly is "pivotally coupled to the television holder assembly and the mounting assembly" in a manner "wherein the arm assembly arm is operable to move the television holder assembly between a raised position and a lowered position." '080 Patent col. 24 ll. 7–34.

Nothing in the claim language requires a direct connection between the components at issue or the specific use of a separate "pivot" component in order to achieve the claimed coupling.  Rather, the claim language uses the terms "rotatably coupled" and "pivotally coupled" in their plain and ordinary meanings, which as MantelMount correctly explains, is two objects that are connected to each other in a manner that allows for the two objects to pivot or rotate relative to one another.  (See ECF No. 44 at 1.)  As such, the claim language does not support Mount-It's proposed construction.

In an effort to support its proposed construction, Mount-It relies primarily on the specifications of the asserted patents.  (See ECF No. 39 at 6–7.)  Mount-It notes that the specification of the '037 Patent describes a wall mount where "'a support bracket end 222 [is] rotatably coupled to the support bracket 140 by the pivot 192.'"  (Id. (quoting '037 Patent col. 6 ll. 46–50).)  Mount-It also notes that portions of the specification define axes of rotation between components using the pivots.  (Id. (citing '037 Patent col. 3 ll. 4–17, col. 6 ll. 30–34, col. 6 ll. 60–63).)  But all of the specifications cited by Mount-It are descriptions of preferred embodiments.  See '037 Patent col. 3 l. 4 ("in some embodiments"), col. 3 ll. 64–65 ("Non-limiting and non-exhausting embodiments are discussed with reference to the following drawings.").  "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."  Dealertrack, 674 F.3d at 1327; accord

11

Openwave, 808 F.3d at 514; see also Info-Hold, Inc. v. Applied Media Techs. Corp., 783 F.3d 1262, 1267 (Fed. Cir. 2015) ("[W]e have 'expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.'"). Mount-It has not identified any language in the intrinsic record showing a clear indication that the patentee intended "rotatably coupled" or "pivotally coupled" to be limited to direct connection via a "pivot" component.

To the contrary, MantelMount has identified language in the specification showing that Mount-It's proposed construction would exclude certain preferred embodiments of the invention from the scope of the claims. This is noteworthy because "'[a] claim construction that excludes a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.'" Kaufman v. Microsoft Corp., 34 F.4th 1360, 1372 (Fed. Cir. 2022) (quoting Epos Technologies Ltd. v. Pegasus Technologies Ltd., 766 F.3d 1338, 1347 (Fed. Cir. 2014)); see Duncan Parking Techs., Inc. v. IPS Grp., Inc., 914 F.3d 1347, 1364 (Fed. Cir. 2019) ("[A] claim construction that excludes the preferred embodiment is highly disfavored."). The '037 Patent's specification describes an embodiment where the linkage assembly is connected to the support bracket and is able to both swivel and pivot relative to the support bracket. See '037 Patent col. 9 l. 58 to col. 7 l. 3, fig. 27; see also id. at col. 1 ll. 49–51 ("Pivots, swivels (e.g., swivel brackets), joints, or the like can be used to provide the desired motion."). Mount-It's proposed construction requiring that the coupling be achieved specifically through a direct connection via a "pivot" component would exclude that embodiment from the claims. As such, the Court declines to adopt Mount-It's proposed construction for this claim term.

In sum, the Court rejects Mount-It's proposed constructions for the claim terms "rotatably coupled" and "pivotally coupled." Instead, the Court will adopt constructions for these claim terms based on the plain and ordinary meaning for these terms provided in MantelMount's responsive claim construction brief. (ECF No. 44 at 1.) The Court construes the claim term "rotatably coupled" as "two objects are connected to each other in a manner that allows for the two objects to rotate relative to one another." And the Court

construes the claim term "pivotally coupled" as "two objects are connected to each other in a manner that allows for the two objects to pivot relative to one another."

### 2.    Ordering of Steps for Method Claims 17 and 18

Mount-It contends that the "mounting" step and the "coupling" step within method claims 17 and 18 of the '860 Patent must occur before the "configuring" step. (ECF No. 39 at 7.) MantelMount contends that no particular order of operations is required by claims 17 and 18 of the '860 Patent. (ECF No. 40 at 11.)

Claim 17 and 18 of the '860 Patent are method claims. See '860 Patent col. 12 ll. 29–55. "As a general rule, unless the steps of a method claim actually recite an order, the steps are not ordinarily construed to require one." Sound View Innovations, LLC v. Hulu, LLC, 166 F.4th 958, 965 (Fed. Cir. 2026) (cleaned up). "However, a claim requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires an order of steps." Id. (internal quotation marks omitted); accord Amgen Inc. v. Sandoz Inc., 923 F.3d 1023, 1028 (Fed. Cir. 2019).

The claim language at issue here is as follows:

A method comprising:

mounting a support bracket of a mounting system on a vertical wall such that the support bracket is positioned above a fireplace;

coupling a television to a display bracket of the mounting system;

configuring the mounting system to prevent contact between a linkage assembly of the mounting system and a mantel below the support bracket when lowering at least a portion of the television below a top of the mantel, wherein the linkage assembly is movable between a raised configuration and a lowered configuration, wherein the linkage assembly includes at least one arm pivotally coupled to the support bracket;

'860 Patent col. 12 ll. 29–42. Here, the claim language describes three distinct steps: a "mounting" step, a "coupling" step, and a "configuring" step. Id.

Mount-It contends that the above claim language logically and grammatically requires that the "mounting" step and the "coupling" step occur prior to the "configuring"

step.  (ECF No. 39 at 8–9.)  The Court disagrees.  MantelMount correctly argues that, in certain situations, it is possible for the configuring step to occur at least in part prior to the "mounting" step and the "coupling" step.  (ECF No. 40 at 12–13; ECF No. 44 at 3; see also ECF No. 51 at 36–37, 41.)  MantelMount explains, for example, the "configuring" step could be performed on a predetermined basis based on the dimensions of the television, the mount, and the fireplace to ensure that once the television is mounted above the fireplace, the linkage assembly will not make contact with the mantel when the television is lowered below the top of the mantel.  (See ECF No. 40 at 12–13.)  In light of this possibility, the claim language does not as a matter of logic or grammar require that the "configuring" step occur only after the "mounting" and "coupling" steps.

Mount-It asserts that the intrinsic record of the '860 Patent does not describe an embodiment where the "configuring" step is performed prior to the "mounting" and "coupling" steps.  (ECF No. 43 at 2.)  This may be true, but it is of no consequence.  "'[C]laims are not necessarily and not usually limited in scope simply to the preferred embodiment.'"  Akamai Techs., Inc. v. Limelight Networks, Inc., 805 F.3d 1368, 1375 (Fed. Cir. 2015); see also Info-Hold, 783 F.3d at 1267 ("[W]e have 'expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.'").  Thus, method claims 17 and 18 are not limited to the preferred embodiments described in the '860 Patent's specification, and, therefore, the Court should not limit method claims 17 and 18 to require a certain order when the claim language as a matter of logic and grammar does not require it.

In sum, the Court rejects Mount-It's contention that the "configuring" step in Claims 17 and 18 of the '860 Patent must occur after the "mounting" step and the "coupling" step. The Court declines to construe method Claims 17 and 18 of the '860 Patent to require any specific ordering of the claimed steps.

3.   "piston"

Mount-It proposes that the claim term "piston" from Claim 17 of the '860 Patent be

24-cv-01814-BJC (MMP)

given its plain and ordinary meaning, which Mount-It contends is "a component that moves within a fluid-filled cylinder, creating resistance to control movement." (ECF No. 39 at 11.) MantelMount proposes that the claim term be construed as "a gas piston, pneumatic piston, or other type of biasing device capable of providing a desired force, including, without limitation, a substantially constant force, variable force, or the like." (ECF No. 40 at 13–14.)

The Court begins its analysis of this claim construction dispute by reviewing the claim language. Independent Claim 17 of the '860 Patent recites a method comprising, among other things:

> adjusting a counterbalancing mechanism by rotating a threaded member to move a piston of the counterbalancing mechanism relative to the linkage assembly so as to position the piston at a first position to provide a first counterbalancing force, and the threaded member is rotatable to position the piston at a second position to provide a second counterbalancing force that is different from the first counterbalancing force[.]

'860 Patent col. 12 ll. 43–50. Here, the claim language explains that the claimed "counterbalancing mechanism" has a "piston" that moves relative to the "linkage assembly." The claim language expressly uses the term "piston," and it does not make any reference to any "biasing device capable of providing a desired force." As such, the claim language does not support MantelMount's proposed construction.

MantelMount argues that its proposed construction for this claim is supported by a definition contained in the specification. A patentee "may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." Alnylam Pharms., Inc. v. Moderna, Inc., 138 F.4th 1326, 1333 (Fed. Cir. 2025) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)); see also Thorner v. Sony Computer Ent. Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (explaining that a patentee setting out a definition and acting as his own lexicographer is an exception to the general rule that plain and ordinary meaning should govern). The

24-cv-01814-BJC (MMP)

Federal Circuit has explained that the standard for lexicography is "exacting." Hill-Rom Servs., Inc. v. Stryker Corp., 755 F.3d 1367, 1371 (Fed. Cir. 2014). "'To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" and must "clearly express an intent to redefine the term.'" Hill-Rom Servs., Inc. v. Stryker Corp., 755 F.3d 1367, 1371 (Fed. Cir. 2014) (quoting Thorner, 669 F.3d at 1365.). "[T]he intrinsic evidence must clearly set forth or clearly redefine a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." Alnylam, 138 F.4th at 1333. But "no magic words" need be used. Hill-Rom, 755 F.3d at 1373.

The '860 Patent's specification uses the following language to describe the counterbalance mechanism and the pistons:

> The counterbalance mechanism 300 can include force balancing devices, illustrated as pistons 310, 320 rotatably coupled to the display bracket 210 and support bracket 140. The pistons 310, 320 can be gas pistons, pneumatic pistons, or other type of biasing devices capable of providing a desired force, including, without limitation, a substantially constant force, variable force, or the like.

'860 Patent col. 7 ll. 45–51. This language does not show a clear intention to define the term "piston." Rather, the language is merely describing preferred embodiments of the invention and explaining that the "counterbalance mechanism 300 can include force balancing devices," and those "force balancing devices" can be pistons 310 and 320, gas pistons, pneumatic pistons, or other "biasing devices capable of providing a desired force." Id. Indeed, in a related patent, the '080 Patent, the specification contains the same language as above but also expressly distinguishes "pistons" from other force balancing devices such as "springs," "gas springs," and "actuators." See '080 Patent col. 1 ll. 61–63 ("Such components can include one or more springs, pistons (e.g., gas pistons), actuators, tilt adjustment mechanisms, or combinations thereof."), col. 2 ll. 37–38 ("counterbalance biasing mechanisms (e.g., a piston, a gas spring, etc.)"); see also Finjan LLC v. ESET, LLC, 51 F.4th 1377, 1382 (Fed. Cir. 2022) ("'The disclosures of related patents may inform

the construction of claim terms common across patents . . . .'"). As such, the Court rejects MantelMount's assertion that the '860 Patent's specification redefines the term "piston."

Because the specification does not redefine the claim term "piston," the term should be given its plain and ordinary meaning. See Thorner, 669 F.3d at 1365; Hill-Rom, 755 F.3d at 1373. Mount-It has provided the Court with definitions from both technical dictionaries and general dictionaries, stating that a "piston" is a cylindrical component that moves within a larger fluid-filled cylinder, creating resistance to control movement. (See ECF No. 39-13, Ex. 12, Dictionary of Mechanical Engineering (4th ed. 1996) ("A solid or hollowed cylindrical plunger which reciprocates in a cylinder either under fluid pressure in an engine or to display or compress a fluid in pumps and compressors."); ECF No. 39-14, Ex. 13, The New Oxford American Dictionary (2d ed. 2005) ("a disk or short cylinder fitting closely within a tube in which it moves up and down against a liquid or gas, used in an internal combustion engine to derive motion, or in a pump to impart motion."); ECF No. 39-15, Ex. 14, The American Heritage College Dictionary (4th ed. 2007) ("A cylinder or disk that fits into a larger cylinder and moves under fluid pressure, as in a reciprocating engine, or displaces or compresses fluids, as in a pump.").) As such, the Court will adopt Mount-It's proposed construction for the claim term "piston," which properly incorporates the plain and ordinary meaning for the term contained in these dictionaries.

At the claim construction hearing, MantelMount contended that if the Court adopts Mount-It's proposed construction, it will render the statement in the specification explaining that other force balancing devices can be used false. (See ECF No. 51 at 45.) That is incorrect. The statement in the specification remains true. The overall invention disclosed in the '860 Patent's specification can include pistons, springs, and/or actuators. But, in the specific claim at issue (Independent Claim 17), the patentee did not claim a force balancing device, a biasing device capable of providing a desired force, a spring, or an actuator. Rather, the patentee specifically chose to claim a "piston" and only a "piston." '860 Patent col. 12 ll. 43–50. As such, Claim 17 only encompasses pistons and not the other force balancing devices described in the specification.

In sum, the Court adopts Mount-It's proposed construction for the claim term "piston." The Court construes the term "piston" as "a component that moves within a fluid-filled cylinder, creating resistance to control movement."

4        "configuring the mounting system"

Mount-It proposes that the claim term "configuring the mounting system" from claim 17 of the '860 Patent be construed as "adjusting the structure of or programming the mounting system." (ECF No. 39 at 9.) MantelMount proposes that the claim term be given its plain and ordinary meaning and contends that no additional construction is necessary. (ECF No. 40 at 16.)

The Court begins its analysis of this claim construction dispute by reviewing the claim language. Claim 17 of the '860 Patent recites a method comprising, among other things:

> configuring the mounting system to prevent contact between a linkage assembly of the mounting system and a mantel below the support bracket when lowering at least a portion of the television below a top of the mantel, wherein the linkage assembly is movable between a raised configuration and a lowered configuration, wherein the linkage assembly includes at least one arm pivotally coupled to the support bracket;

'860 Patent col. 12 ll. 35–42. Here, the claim language itself explains what is meant by the term "configuring the mounting system." The claim language explains that "configuring the mounting system" means arranging the mounting system in a sufficient manner to prevent contact between a linkage assembly of the mounting system and a mantel below the support bracket when lowering a portion of the television below the top of the mantel.

In an effort to support its proposed construction, Mount-It relies primarily on the '860 Patent's specification. (See ECF No. 39 at 9–10 (citing '860 Patent col. 3 ll. 45–51, col. 5 ll. 49-61, col. 8 ll. 38–46, fig. 3); ECF No. 43 at 3.) Mount-It contends that the specification explains that the "configuring the mounting system" step occurs either by physically adjusting the mounting system using stops or by programming a motorized system within the mount. (See id.) Mount-It's reliance on the specification is

18

unpersuasive. All of Mount-It's citations are to descriptions of preferred embodiments described in the specification. See '860 Patent col. 3 l. 45 ("In some embodiments, . . . ."), col. 5 l. 49 ("In some manually deployable embodiments, . . . ."), col. 8 l. 40 ("In some embodiments, . . . ."); see also id. at col. 4 ll. 6–7. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." Dealertrack, 674 F.3d at 1327; accord Openwave, 808 F.3d at 514; see also Info-Hold, 783 F.3d at 1267 ("[W]e have 'expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.'"). Mount-It has not identified any language in the intrinsic record showing a clear indication that the patentee intended the configuring step to be limited to the specific examples described in the specification. As such, the Court declines to adopt Mount-It's proposed construction for this claim term.

Mount-It contends that MantelMount's claim construction position with respect to this claim term is improper because it would render other claim language superfluous. (ECF No. 39 at 11.) Specifically, Mount-It contends that giving the configuring step its plain and ordinary meaning will render the mounting step and the adjusting step superfluous. (Id.) Mount-It is incorrect. As explained above, the plain and ordinary meaning of the configuring step as explained by the claim language itself is arranging the mounting system in a sufficient manner to prevent contact between a linkage assembly of the mounting system and a mantel below the support bracket when lowering a portion of the television below the top of the mantel. '860 Patent col. 12 ll. 35–42. In contrast, the mounting step involves mounting a support bracket of a mounting system on a vertical wall such that the bracket is positioned above a fireplace. See id. at col. 12 ll. 30–32. These are two different steps with different requirements. One step involves mounting the support brackets on a wall and the other involves arranging the mounting system in a manner so that there is no contact between the linkage assembly and a mantel. Similarly, the adjusting

24-cv-01814-BJC (MMP)

step is also a different step with different specific requirements than the configuring step. Compare id. at col. 12 ll. 35–42 with id. at col. 12 ll. 43–50.  As such, the Court rejects Mount-It's assertion that giving the configuring step its plain and ordinary meaning would render other claim language superfluous.

In sum, the Court rejects Mount-It's proposed construction for the claim term "configuring the mounting system."  The Court declines to construe the claim term and, instead, the Court gives the claim term "configuring the mounting system" its plain and ordinary meaning.[1]

5.    "to automatically swivel via the swivel mechanism"

Mount-It proposes that the claim term "to automatically swivel via the swivel mechanism" in claims 19, 21, and 22 of the '080 Patent be construed as "movement by a

---

[1]    Mount-It contends that because the parties dispute the scope of this claim term, the Court must construe the claim under O2 Micro.  (ECF No. 39 at 10–11.)  Mount-It is incorrect.  Under O2 Micro, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  521 F.3d at 1362.  The Federal Circuit has explained that, in some instances, a determination that a claim term needs no construction or has plain and ordinary meaning may be inadequate, such as when the term's ordinary meaning does not resolve the parties' specific claim construction dispute.  See Eon, 815 F.3d at 1318 (citing O2 Micro, 521 F.3d at 1361).  But that is not the case here.

Here, the parties' dispute with respect to this claim term is that Mount-It contends that the "configuring" step of the claimed method should be limited to the examples described in the specification, and MantelMount disagrees and argues that the Court should reject these proposed limitations and instead give the term its plain and ordinary meaning. By giving the claim term its plain and ordinary meaning, the Court has rejected Mount-It's proposed limitations and thereby resolved the parties' dispute with respect to the scope of this claim term in compliance with the Court's duties under Eon and O2 Micro.  See, e.g., ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1326 (Fed. Cir. 2012); Summit 6, 802 F.3d at 1291 (finding district court did not violate the principles of O2 Micro by giving claim term its plain and ordinary meaning); DNA Genotek Inc. v. Spectrum Sols. L.L.C., No. 3:21-CV-00516-RSH-DDL, 2022 WL 17331255, at *29 n.30 (S.D. Cal. Nov. 29, 2022), aff'd sub nom. DNA Genotek Inc. v. Spectrum Sols. LLC, No. 2023-2017, 2025 WL 502040 (Fed. Cir. Feb. 14, 2025) ("By giving the claim term its plain and ordinary meaning, the Court has rejected Spectrum's proposed requirement and thereby resolved the parties' dispute . . . .").

24-cv-01814-BJC (MMP)

motorized swivel without user intervention." (ECF No. 39 at 14.)  MantelMount proposes that the claim term be given its plain and ordinary meaning and contends that no additional construction is necessary.  (ECF No. 40 at 17.)

For this claim term, the parties dispute how precisely the claimed "swivel" movement must be accomplished.  Mount-It contends that the swivel movement must be accomplished via a specific motorized swivel component.  (See ECF No. 39 at 14–16; ECF No. 43 at 5.)  In contrast, MantelMount contends that the swivel movement need only be accomplished non-manually and automatically, but not necessarily by a motor.  (See ECF No. 51 at 50–53.)

The Court begins its analysis of the parties' dispute by reviewing the claim language. Independent Claim 19 of the '080 Patent recites:

A motorized television mounting system, comprising:

a television holder assembly configured to hold a television;

a mounting assembly;

an arm assembly pivotally coupled to the television holder assembly and the mounting assembly, wherein the arm assembly arm is operable to move the television holder assembly between a raised position and a lowered position, wherein at least a portion of the television holder assembly is lower than the mounting assembly when the television holder assembly is at the lowered position;

a swivel mechanism that swivels the television relative to the arm assembly;

a motorized system that includes a motorized device configured to drive the television holder assembly between the raised position and the lowered position; and

a control device configured to communicate with a controller and configured to control operation of the motorized device based on one or more signals from the controller to cause the motorized device to vertically move the television holder assembly, wherein the motorized system is configured to operate to cause the television to automatically swivel via the swivel mechanism.

'080 Patent col. 24 ll. 7–33.  Here, the claim language recites a "motorized television mounting system" that includes a "motorized system" with a "motorized device" that is

24-cv-01814-BJC (MMP)

configured to drive the television holder assembly between a raised position and a lowered position. See id. The claim language further states that the "motorized system" is also configured to cause the television to automatically swivel via the swivel mechanism. See id. MantelMount's claim construction position is incorrect in light of this claim language. The claim language expressly states that the motorized system within the motorized television mounting system is what causes the automatic swiveling of the television via the swivel mechanism. See id. col. 24 ll. 31–33. Therefore, MantelMount's contention that the swivel need not be accomplished via a motor is entirely inconsistent with the claim language.[2]

MantelMount notes that, unlike other claims in the '080 Patent, Claim 19 does not specifically claim a "motorized swivel." (See ECF No. 44 at 6; ECF No. 51 at 55.) See, e.g., '080 Patent col. 22 l. 62. MantelMount is correct that the claim language at issue here does not specifically claim a "motorized swivel." But that is of no matter because Claim 19 does specifically claim "a motorized system" within the motorized television mounting system that causes the automatic swiveling of the television via the swivel mechanism. '080 Patent col. 24 ll. 31–33. Therefore, under the claim language, the claimed swiveling is accomplished via a motor within the claimed motorized system.[3]

---

[2] At the claim construction hearing, MantelMount contended that "the motorized system refers to the entire mount." (ECF No. 51 at 64.) This argument is also inconsistent with the claim language. In reciting the claimed "motorized television mounting system," the claim language sets forth several components of the overall system, one of which is the "motorized system." '080 Patent col. 24 ll. 7–33. As such, under the claim language, the motorized system is a component of the motorized television mounting system and not the entire overall mount.

[3] In an effort to support its contention that the claimed swiveling must be accomplished via a motor, Mount-It directs the Court to the prosecution history for the '080 Patent. (See ECF No. 39 at 15–16; ECF No. 43 at 6.) The Court has reviewed the cited prosecution history and declines to include it as part of the claim construction analysis here. The prosecution history is vague as to why precisely the patentee thought Claim 19 was in condition for allowance when it added the claim. (See ECF No. 39-16, Ex. 15 at 511.) See also Phillips, 415 F.3d at 1317 ("because the prosecution history represents an

MantelMount argues that the Court should not adopt Mount-It's proposed construction because the phrase "without user intervention" might confuse the jury. On this specific point, the Court agrees with MantelMount. The claim language in the '080 Patent provides that the automatic swiveling via the motorized system can be initiated via the control device, which can be operated by the user. See '080 Patent col. 24 ll. 48–49 ("wherein the control device is configured to set at least one of tilt or swivel of the television"), col. 24 ll. 51–52 ("wherein the automatic swiveling of the television is set by a user"). Thus, the claim language contemplates that some user intervention can occur in order to accomplish the automatic swiveling. Nevertheless, the specification of the '080 Patent expressly distinguishes between manual movement of the television by the user and automatic movement of the television. See, e.g., '080 Patent col. 2 ll. 3–5 ("A user can manually or automatically lower the television such that a viewer's eyes are at an appropriate position relative to the television."), col. 7 ll. 30–31 ("the television 110 can be further tilted using an automatic or manual tilt mechanism"). In light of this, a better claim construction for this claim term would be to distinguish automatic swiveling by the user from manual swiveling by the user as opposed to using the phrase "without user intervention."

In sum, the Court declines to adopt Mount-It proposed construction for the claim term "to automatically swivel via the swivel mechanism," and the Court rejects MantelMount's claim construction position with respect to this term. Instead, the Court construes "to automatically swivel via the swivel mechanism" as "swiveling of the television that is caused by a motor within the motorized system and without any manual operation by the user."

---

ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity"). Further, reliance on the prosecution history is unnecessary here as the claim language itself clearly states that the claimed swiveling is accomplished via the motorized system.

24-cv-01814-BJC (MMP)

### 6.    "positioner"

Mount-It argues that the claim term "positioner" in Claims 30 and 35 of the '180 Patent is indefinite.  (ECF No. 39 at 16–19.)  MantelMount argues that the claim term is definite and contends that no additional construction is necessary.  (ECF No. 40 at 19.)

"Definiteness is a statutory requirement for patentability."  Niazi Licensing Corp. v. St. Jude Med. S.C., Inc., 30 F.4th 1339, 1346 (Fed. Cir. 2022).  Under 35 U.S.C. § 112(b), a patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention."  35 U.S.C. § 112(b).

"A claim fails to satisfy this statutory requirement and is thus invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'"  Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1369–70 (Fed. Cir. 2014) (quoting Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014)); see Infinity Computer Prod., Inc. v. Oki Data Americas, Inc., 987 F.3d 1053, 1059 (Fed. Cir. 2021) ("'[W]e look to the patent record—the claims, specification, and prosecution history—to ascertain if they convey to one of skill in the art with reasonable certainty the scope of the invention claimed.'" (quoting Teva Pharms. USA, Inc. v. Sandoz, Inc., 789 F.3d 1335, 1341 (Fed. Cir. 2015))).  This "reasonable certainty" standard "reflects a 'delicate balance' between 'the inherent limitations of language' and providing 'clear notice of what is claimed.'"  Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n, 936 F.3d 1353, 1359 (Fed. Cir. 2019).  "Th[e] standard 'mandates clarity, while recognizing that absolute precision is unattainable.'"  Nevro Corp. v. Bos. Sci. Corp., 955 F.3d 35, 39 (Fed. Cir. 2020) (quoting Nautilus, 572 U.S. at 910); see also BASF Corp. v. Johnson Matthey Inc., 875 F.3d 1360, 1365 (Fed. Cir. 2017) ("'Reasonable certainty' does not require 'absolute or mathematical precision.'").

"General principles of claim construction apply to indefiniteness allegations."  HZNP Medicines LLC v. Actavis Lab'ys UT, Inc., 940 F.3d 680, 688 (Fed. Cir. 2019).

24

The party asserting indefiniteness bears "the burden of proving indefiniteness by clear and convincing evidence." BASF, 875 F.3d at 1365 (citing Biosig Instruments, Inc. v. Nautilus, Inc., 783 F.3d 1374, 1377 (Fed. Cir. 2015)); see also Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 95 (2011) (holding that 35 U.S.C. § 282 "requires an invalidity defense to be proved by clear and convincing evidence").

The Court begins its analysis of this claim construction issue by reviewing the claim language. Independent Claim 30 of the '180 Patent recites a television mounting system, comprising, among other things: a "support bracket," a "display bracket," a "linkage assembly" that "is movable between a raised configuration and a lowered configuration," and a "positioner configured to contact a portion of the television mounting system to cause the display bracket to rotate relative to the linkage assembly when the linkage assembly is moved toward the raised configuration." '180 Patent col. 25 ll. 38–54. Here, the claim language provides meaningful guidance regarding the claim term "positioner." The claim language explains that the positioner is a component of the television mounting system that causes the display bracket to rotate relative to the linkage assembly when the linkage assembly is moved toward its raised configuration. See id. In light of this, the claim language alone is sufficient to inform a PHOSITA about the scope of the invention with reasonable certainty.[4]

Mount-It itself notes that the '180 Patent's specification provides further guidance to PHOSITAs regarding what is meant by the term "positioner." (See ECF No. 39 at 16–19.) However, Mount-It takes issue with the descriptions contained in the '180 Patent because, according to Mount-It, the specification uses the term "positioner" to describe multiple different types of structures. (See id. at 16–17; see also ECF No. 51 at 70–72

---

[4]    The Court notes the claim language's usage of the term "positioner" is consistent with the plain and ordinary meaning for the term "positioner" provided by MantelMount at the claim construction hearing, which is "a mechanical device for placing or holding a body in position." (ECF No. 51 at 69.)

(describing the different types of positioners referenced in the specification)).  But that is not a basis for finding the claims at issue indefinite.  As explained above, the claim language provides reasonable certainty regarding the scope of the term "positioner."  The fact that multiple different types of structures can constitute a "positioner" simply means that the claim term is broad, not that it is indefinite.  "[A] claim is not indefinite just because it is broad."  Niazi Licensing Corp. v. St. Jude Med. S.C., Inc., 30 F.4th 1339, 1347 (Fed. Cir. 2022); see also BASF, 875 F.3d at 13657 ("breadth is not indefiniteness").

Mount-It also contends that the term is indefinite because the claim language does not specify what precise portion of the mounting system the positioner must contact, and the claim language does not specify the precise type of rotation that will occur between the display bracket and the linkage assembly.  (See ECF No. 39 at 18–19.)  But, again, these are challenges that go to how broad the claim term is, not to whether a PHOSITA can understand what is being claimed.  That the claim can be properly interpreted by a PHOSITA to cover any type of rotation between the display bracket and the linkage assembly caused by the positioner as opposed to one specific type of rotation is simply a matter of claim breadth.  A PHOSITA would still know with reasonable certainty what type of rotation falls within the scope of the claim (i.e., any rotation between the display bracket and the linkage assembly that is caused by the positioner).

In an effort to demonstrate that the claim term is indefinite, Mount-It also relies on the prosecution history.  (See ECF No. 39 at 17; ECF No. 43 at 7.)  The prosecution history shows that the Examiner initially stated that "it is unclear what element or elements of the disclosed invention is being referenced as the positioner." (ECF No. 39-17, Ex. 16 at 629.)  But the prosecution history also shows that the Examiner later was able to conduct an interview with the patentee and then understood that "top tilt mechanism 1270" in figures 68, 68A, and 68B constituted the "positioner" at issue, and the Examiner then allowed the claims at issue.  (See id. at 659, 668, 684; see also id. at 629–30 ("It appears that the element that most closely matches the above claims is the top tilt mechanism (1270) . . . .")).  Thus, although there was some initial uncertainty by the Examiner, the Examiner was able to

26

24-cv-01814-BJC (MMP)

understand the claim term and apply it to the embodiments disclosed in the specification. This is evidence that the claim term provides reasonable certainty to a PHOSITA. See Sonix, 844 F.3d at 1380 (explaining that application of the claim term at issue by the examiner "provide[s] evidence that a skilled artisan did understand the scope of this invention with reasonable certainty"). In sum, Mount-It has failed to demonstrate by clear and convincing evidence that the claim term "positioner" renders Claims 30 and 35 of the '180 Patent indefinite.

7. "substantially surrounding"

Mount-It argues that the claim term "substantially surrounding" in Claim 34 of the '042 Patent is indefinite. (ECF No. 39 at 19–21.) MantelMount argues that the claim term is definite and contends that no additional construction is necessary. (ECF No. 40 at 20.)

Mount-It notes that the claim term "substantially surrounding" is a term of degree. (ECF No. 39 at 19.) Mount-It is correct. But "terms of degree are not 'inherently indefinite.'" Liberty Ammunition, Inc. v. United States, 835 F.3d 1388, 1396 (Fed. Cir. 2016) (quoting Interval Licensing, 766 F.3d at 1370); see also Berkheimer v. HP Inc., 881 F.3d 1360, 1364 (Fed. Cir. 2018) ("We do not hold that all terms of degree are indefinite."). Thus, "'a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement.'" Niazi, 30 F.4th at 1347 (quoting Guangdong Alison, 936 F.3d at 1359). Nevertheless, "claims having terms of degree will fail for indefiniteness unless they 'provide objective boundaries for those of skill in the art' when read in light of the specification and the prosecution history." Liberty Ammunition, 835 F.3d at 1396 (quoting Interval Licensing, 766 F.3d at 1370). For example, "a term of degree fails to provide sufficient notice of its scope if it depends "'on the unpredictable vagaries of any one person's opinion.'" Interval Licensing, 766 F.3d at 1371 (quoting Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1350 (Fed. Cir. 2005)); see also, e.g., Berkheimer, 881 F.3d at 1364 (finding claims indefinite where "[t]he specification contain[ed] no point of comparison for skilled artisans to determine an objective boundary" for the claim term).

24-cv-01814-BJC (MMP)

Mount-It contends that the '042 Patent provides no objective standard that a POSITA can use to evaluate the term "substantially surrounding." (ECF No. 39 at 20–21.) Mount-It is wrong. The claim language itself provides such a standard. Claim 34 of the '042 Patent recites:

> The mounting system of claim 31, further comprising a rigid protective body substantially surrounding the carriage and threaded rod while allowing the carriage to move along the threaded rod.

'042 Patent col. 15 ll. 7–10. Here, Claim 34 recites a system with a rigid protective body that substantially surrounds the carriage and the threaded rod. See id. Further, the claim explains that the rigid protective body must surround the carriage and the threaded rod in a manner that allows for the carriage to move along the threaded rod. See id. This explanation contained within the claim language is sufficient to provide a PHOSITA with an objective boundary for determining when a rigid protective body substantially surrounds the carriage and the threaded rod, and that standard does not rely on any unpredictable vagaries of any one person's opinion.

Mount-It contends that the language in the intrinsic record is insufficient to render the claim definite because it does not explain to a PHOSITA "how much a body must surround a carriage and a threaded rod to be considered 'substantially surrounding.'" (ECF No. 39 at 21.) But, by contending that the intrinsic record must set forth precisely how much the body must surround the carriage and the threaded rod, Mount-It is attempting to require that the intrinsic record provide mathematical precision with respect to the claim term "substantially surrounding." The Federal Circuit has repeatedly stated that mathematical precision is not required in order for a claim to meet § 112's definiteness requirement. See Niazi, 30 F.4th at 1347 ("[A] patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement."); BASF, 875 F.3d at 1365 ("'Reasonable certainty' does not require 'absolute or mathematical precision.'"); see, e.g., Ironburg Inventions Ltd. v. Valve Corp., 64 F.4th 1274, 1285 (Fed. Cir. 2023) (rejecting indefiniteness challenges where accused infringer contended that the

claim term "elongate member" was indefinite because the patent failed to explain "how much longer than wider the member must be in order to be 'elongate'"). "Indeed, patentees often use descriptive words to avoid a strict numerical boundary to the specified parameter." Niazi, 30 F.4th at 1347 (cleaned up).  That is precisely what the patentee has done here with respect to the claim term "substantially surrounding," and that is permissible under Federal Circuit case law.  In sum, Mount-It has failed to demonstrate by clear and convincing evidence that the claim term "substantially surrounding" renders Claim 34 of the '042 Patent indefinite.

        8.    "tilt adjustment mechanism"

Mount-It argues that the claim term "tilt adjustment mechanism" in claims 20 and 21 of the '317 Patent is a mean-plus-function claim term and is subject to 35 U.S.C. § 112(f).  (ECF No. 39 at 21–22.)  Mount-It proposes that the claimed function for this term be "to adjust the tilt of the television bracket" and the corresponding structure is "a device that shortens or increases the length of the lower arm to cause the television bracket to tilt."  (Id.)  MantelMount argues that the claim term is not a means-plus-function term and contends that no additional construction is necessary.  (ECF No. 40 at 21.)

Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes § 112(f), formerly § 112 ¶ 6.  Diebold Nixdorf, Inc. v. Int'l Trade Comm'n, 899 F.3d 1291, 1297 (Fed. Cir. 2018); see also Dyfan, LLC v. Target Corp., 28 F.4th 1360, 1365 (Fed. Cir. 2022) ("Limitations that invoke § 112 ¶ 6 are generally known as 'means-plus-function' or 'step-plus-function' limitations.").  Section 112(f) of the Patent Act provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

s35 U.S.C. § 112(f) (current); accord 35 U.S.C. § 112 ¶ 6 (pre-America Invents Act ("AIA")).[5]  In enacting this provision, Congress "'struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function,' while 'placing specific constraints on how such a limitation is to be construed'—that is, by restricting the 'scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof.'"  Diebold Nixdorf, 899 F.3d at 1297 (quoting Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc)).

"The overall means-plus-function analysis is a two-step process." Dyfan, 28 F.4th at 1365.  "The first step is to determine whether a claim limitation is drafted in means-plus-function format, which requires [the court] to construe the limitation to determine whether it connotes sufficiently definite structure to a person of ordinary skill in the art." Id.  "If the limitation connotes sufficiently definite structure, it is not drafted in means-plus-function format, and § 112 ¶ 6 does not apply." Id.  If, however, the court concludes that the limitation is in means-plus-function format, the court performs the second step of "determining 'what structure, if any, disclosed in the specification corresponds to the claimed function.'" Id. (quoting Williamson, 792 F.3d at 1351).

"If the limitation uses the word 'means,' there is a rebuttable presumption that § 112 ¶ 6 applies." Rain Computing, Inc. v. Samsung Elecs. Am., Inc., 989 F.3d 1002, 1005 (Fed. Cir. 2021).  "If not, there is a rebuttable presumption that the provision does not apply." Id.  But "the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure'

---

[5]    The Court notes that the above language in the current version of § 112(f) is identical to the language in paragraph 6 of the pre-AIA version of § 112.  Compare 35 U.S.C. § 112(f) with 35 U.S.C. § 112 ¶ 6 (pre-AIA); see also Maxell, Ltd. v. Amperex Tech. Ltd., 94 F.4th 1369, 1372 (Fed. Cir. 2024) ("The AIA relabeled § 112 ¶ 2 as § 112(b) but made no change in the language material to this case.").

or else recites 'function without reciting sufficient structure for performing that function.'" Williamson, 792 F.3d at 1349. "Whether claim language invokes 35 U.S.C. § 112 ¶ 6 is a question of law." Rain, 989 F.3d at 1005.

Independent claim 20 of the '317 Patent recites a mounting system comprising, among other components: "a tilt adjustment mechanism having an unlocked state to adjust tilt of the television bracket relative to the fixed support bracket and a locked state to hold the tilt of the television bracket relative to the fixed support bracket." '317 Patent col. 15 ll. 14–18. Here, claim language and the claim term at issue – "tilt adjustment mechanism" – does not use the precise word "means." Id. Therefore, there is a rebuttable presumption that § 112(f) does not apply. See, e.g., Rain, 989 F.3d at 1005; Fintiv, Inc. v. PayPal Holdings, Inc., 134 F.4th 1377, 1381 (Fed. Cir. 2025). In order for this presumption to be overcome, Mount-It must demonstrate "that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" Williamson, 792 F.3d at 1349.

"One way to demonstrate that a claim limitation fails to recite sufficiently definite structure is to show that, although not employing the word 'means,' the claim limitation uses a similar 'nonce word that can operate as a substitute for 'means' in the context of § 112, para. 6.'" MTD Prods. Inc. v. Iancu, 933 F.3d 1336, 1341 (Fed. Cir. 2019) (quoting Williamson, 792 F.3d at 1350); Zeroclick, LLC v. Apple Inc., 891 F.3d 1003, 1008 (Fed. Cir. 2018) (Nonce words "can operate as substitutes for 'means' and presumptively bring the disputed claims limitations within the ambit of § 112, ¶ 6."). The Federal Circuit has explained: "Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112, para. 6." Williamson, 792 F.3d at 1350; accord Dyfan, 28 F.4th at 1365; see also Egenera, Inc. v. Cisco Sys., Inc., 972 F.3d 1367, 1373 (Fed. Cir. 2020) (Nonce words "may amount to 'generic terms or black box recitations of structure or abstractions.'" (quoting MTD, 933 F.3d at 1341).

When evaluating a claim term containing a nonce word, the "critical question is whether 'the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure,' including either a particular structure or a class of structures." MTD, 933 F.3d at 1341. "'What is important is . . . that the term, as the name for structure, has a reasonably well understood meaning in the art.'" Dyfan, 28 F.4th at 1365 (quoting Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1583 (Fed. Cir. 1996)).

Although the claim term at issue does not use the word "means," it uses the word "mechanism." '317 Patent col. 15 l. 14. The Federal Circuit has explained that the word "mechanism" is a nonce word that is nothing more than a verbal construct and typically does not connote a sufficiently definite structure. Williamson, 792 F.3d at 1350; see Abiomed Inc. v. Maquet Cardiovascular LLC, No. 2024-1062, 2026 WL 346501, at *6 (Fed. Cir. Feb. 9, 2026) ("'Mechanism' is a nonce term that is 'tantamount to using the word "means."'"). Nevertheless, the Federal Circuit has also explained: "even if the claims recite a nonce term followed by functional language, other language in the claim 'might inform the structural character of the limitation-in-question or otherwise impart structure' to the claim term." MTD, 933 F.3d at 1341–42 (quoting Williamson, 792 F.3d at 1351). "The ultimate question is whether 'the claim language, read in light of the specification, recites sufficiently definite structure to avoid § 112, ¶ 6.'" Id. at 1342.

Therefore, the Court must review the remainder of the relevant claim language in claims 20 and 21 to determine if it recites sufficiently definite structure. It does not. The remainder of the relevant claim language in independent claim 20 explains that the "tilt adjustment mechanism" has an "unlocked state to adjust tilt of the television bracket relative to the fixed support bracket" and a "locked state to hold the tilt of the television bracket relative to the fixed support bracket." '317 Patent col. 15 ll. 14–18. This is purely functional language that does not impart any sufficiently definite structure to the claim term "tilt adjustment mechanism." The claim language simply explains that the function of the "tilt adjustment mechanism" to adjust the tilt of the television bracket relative to the fixed support bracket when the mechanism is in an unlocked state and to hold the tilt of the

24-cv-01814-BJC (MMP)

television bracket relative to the fixed support bracket when the mechanism is in a locked state. The claim language in claim 20 does not describe any specific structure for achieving these two functions.

The claim language in claim 21 is similar. Dependent claim 21 recites: "The mounting system of claim 20, wherein the tilt adjustment mechanism includes a rotatable member in a slot of the mounting system, wherein the rotatable member is movable along the slot for leveling the television bracket when the tilt adjustment mechanism is in the unlocked state." '317 Patent col. 15 ll. 19–23. This claim language describes some structure of the tilt adjustment mechanism: "a rotatable member in a slot of the mounting system." Id. But this is not a structure for achieving the function mentioned in independent claim 20. Rather, the language in claim 21 explains that this structure is for achieving a different function: "leveling the television bracket when the tilt adjustment mechanism is in the unlocked state." Id. Therefore, the claim language in claim 21 also does not describe a sufficiently specific structure for achieving the two functions mentioned above.

In an effort to demonstrate that the claim language provides a sufficiently definite structure for term "tilt adjustment mechanism," MantelMount directs the Court to language in claims 8, 9, 16, and 22 of the '317 Patent. (See ECF No. 40 at 22–23.) But those claims are not at issue here. The only claims at issue are claims 20 and 21 of the '317 Patent. (See ECF No. 35-1 at 51–53.) Claims 8, 9, 16, and 22 contain different claim language and presumably different scope as claims 20 and 21. See Sound View Innovations, LLC v. Hulu, LLC, 166 F.4th 958, 966 (Fed. Cir. 2026) ("[T]here is 'a presumption that distinct claims . . . have different scopes.' This presumption means 'that the difference between claims is significant,' and we should be wary of importing limitations of one claim into another." (citations omitted)). As such, claims 8, 9, 16, and 22 are of no aid to the Court here in determining whether the remaining claim language in claims 20 and 21 provides sufficiently definite structure for the claimed term "tilt adjustment mechanism."

In an effort to demonstrate that the '317 Patent provides a sufficiently definite structure for the claim term "tilt adjustment mechanism," MantelMount also noted during

24-cv-01814-BJC (MMP)

the claim construction hearing that the specification of the '317 Patent describes a "locking mechanism" that can be in the form of a "fine tilt adjudgment mechanism." (ECF No. 51 at 99 (citing '317 Patent col. 9 ll. 27–30).) However, this language in the specification is of no aid here because it is merely describing preferred "embodiments" of the invention. See '317 Patent col. 9 ll. 27–28 ("In other embodiments, the locking mechanism 245 can be in the form of a fine tune tilt adjustment mechanism."); see also id. col. 4 ll. 26–27 ("Non-limiting and non-exhausting embodiments are discussed with reference to the following drawings."). "[A] preferred embodiment disclosed in the specification cannot impart structure to a term that otherwise has none." MTD, 933 F.3d at 1341. "That the specification discloses a structure corresponding to an asserted means-plus-function claim term does not necessarily mean that the claim term is understood by persons of ordinary skill in the art to connote a specific structure or a class of structures." Id. at 1344.

In sum, the claim language in Claims 20 and 21, read in light of the specification, does not provide sufficient definite structure for the claim term "tilt adjustment mechanism." As such, Mount-It has met its burden of demonstrating that 35 U.S.C. § 112(f) applies to the claim term "tilt adjustment mechanism" in Claims 20 and 21 of the '317 Patent, and the claim term is a means-plus-function claim term.

Because the term "tilt adjustment mechanism" in Claims 20 and 21 is a means-plus-function limitation, the Court must now perform the step of "determining 'what structure, if any, disclosed in the specification corresponds to the claimed function.'" Dyfan, 28 F.4th at 1365 (quoting Williamson, 792 F.3d at 1351). As explained above, the claimed function for the claim term "tilt adjustment mechanism" is to adjust the tilt of the television bracket relative to the fixed support bracket when the mechanism is in an unlocked state and to hold the tilt of the television bracket relative to the fixed support bracket when the mechanism is in a locked state. See '317 Patent col. 15 ll. 14–18.

Mount-It correctly notes that the specification at column 7, lines 18 through 39 discloses a corresponding structure for that claimed function. (See ECF No. 39 at 22–23.) The specification states:

With reference to FIG. 6, the link 178 a includes rigid slotted members 232, 234 and pins extending through the members 232, 234. The slotted members 232, 234 are slidable relative to one another. An adjustment mechanism in the form of a tilt adjustment mechanism 240 is slidably retained in a slot of the member 232 and a hole in the member 234. A handle 242 can be rotated to lock and unlock the link 178 a. To lengthen the link 178 a, the handle 242 is rotated counter-clockwise and the member 232 is slid away from the support bracket 140, as indicated by an arrow 246. The length of the link 178 a can be increased to rotate the display bracket 210 clockwise (indicated by an arrow 254) about a tilt axis of rotation 250 (FIG. 5) defined by the pivots 211. The display bracket 210 can be rotated counter-clockwise about the tilt axis of rotation 250 (indicated by an arrow 256) by sliding the member 232 in the opposite direction. After the television 110 is in the desired orientation, the handle 242 is rotated clockwise to securely hold the member 232 between the member 234 and the handle 242. The dimensions (e.g., the longitudinal lengths) of the slots can be increased or decreased to increase or decrease the amount of tilt. Other locking mechanisms can include, without limitation, one or more rollers, slides (e.g., linear slides), locks, clamps, pins, ratchet mechanisms, or combinations thereof that cooperate to prevent, limit, or inhibit relative movement between components.

'317 Patent col. 7 ll. 18–39. Here, the specification explains that link 178a, rigid slotted members 232 and 234, tilt adjustment mechanism 240, handle 242, and the other locking mechanisms can be used to tilt the television bracket and then hold it in the desired orientation when locked. Thus, the Court will include this corresponding structure in its construction of the claim term "tilt adjustment mechanism."

In response, MantelMount argues that other portions of the specification also provide corresponding structure for the claim term "tilt adjustment mechanism." (ECF No. 44 at 10.) MantelMount first contends that the specifications' description of "adjustment screw 418" provides sufficient corresponding structure for the claim term "tilt adjustment mechanism." In describing "adjustment screw 418," the specification states:

The illustrated head 421 can be moved by rotating the adjustment screw 418. By moving the adjustment screw 418 into and out of the base 416, tilt of the mounted object can be adjusted. For example, adjustment screw 418 can be moved outwardly away from the wall to tilt the display bracket 440 rearwardly.

'317 Patent col. 9 l. 66 to col. 10 l. 10; see also id. figs 20, 20A. This is insufficient to

provide a corresponding structure for the claim term "tilt adjustment mechanism." The specification explains that adjustment screw 418 allows the display bracket to be tilted. But the claimed function for the term the "tilt adjustment mechanism" is not just to tilt the display bracket; it is also to hold the tilt when the "tilt adjustment mechanism" is in a locked state. In describing "adjustment screw 418," the specification never refers to any locked or unlocked state or states that the screw is able to hold the tilt of the display bracket. At the claim construction hearing, MantelMount contended that figure 20 of the specification depicts adjustment screw 418 as not being in contact with the base whereas figure 20A depict adjustment screw 418 making contact with the base. (ECF No. 51 at 106–07.) But, even assuming this true, that adjustment screw 418 is able to make contact or not make contact with the base does not necessarily mean that this is a locked/unlocked state for the adjustment screw, and it does not mean that the adjustment screw is able to hold the display bracket's tilt. As such, the specification's disclosure of "adjustment screw 418" is insufficient to constitute a corresponding structure for the claim term "tilt adjustment mechanism."

MantelMount also contends that the specifications' description of "locking mechanism 245" provides sufficient corresponding structure for the claim term "tilt adjustment mechanism." (ECF No. 44 at 10.) The Court disagrees. The specification describes "locking mechanism 245" from figure 16 and then explains: "In other embodiments, the locking mechanism 245 can be in the form of a fine tune tilt adjustment mechanism and can include one or more gears, ratchet mechanisms, or other features that allow controlled tilting." '317 Patent col. 9 ll. 27–30. In providing this explanation, the specification clearly states that the locking mechanism 245 in the embodiment depicted in figure 16 of the '317 Patent is itself not "a fine tune tilt adjustment mechanism." Further, in describing what components can constitute "a fine tune tilt adjustment mechanism," the specification only uses broad functional language, stating that it can be composed of any "features that allow controlled tilting." Id. col. 9 ll. 29–30. In light of this, the specification's description of "locking mechanism 245" is not sufficient provide a definite

36

24-cv-01814-BJC (MMP)

corresponding structure for the claim term "tilt adjustment mechanism," and the Court will not include it in its construction for the claim term.

In sum, the Court construes the claim term "tilt adjustment mechanism" in Claims 20 and 21 of the '317 Patent as a means-plus-function claim limitation under 35 U.S.C. § 112(f). The claimed function of the term is "to adjust the tilt of the television bracket relative to the fixed support bracket when the mechanism is in an unlocked state and to hold the tilt of the television bracket relative to the fixed support bracket when the mechanism is in a locked state." And the corresponding structure is "link 178a, rigid slotted members 232 and 234, tilt adjustment mechanism 240, and handle 242 (and the other locking mechanisms)" described at column 7, lines 18 through 43 and figure 6 of the '317 Patent.

### III.    CONCLUSION

Accordingly, the Court hereby adopts the constructions set forth above.

**IT IS SO ORDERED.**

Dated:  July 17, 2026

_____

Honorable Benjamin J. Cheeks
United States District Judge

24-cv-01814-BJC (MMP)